IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 04-098 JJF |
| | : | |
| RUSSELL D. BERSCHT, | : | |
| | : | |
| Defendant. | : | |

Amanda L. Riedel, Esquire, and Stacey K. Luck, Esquire of the UNITED STATES DEPARTMENT OF JUSTICE, Washington, DC.

Attorneys for Plaintiff.

Solomon L. Wisenberg, Esquire of WISENBERG & WISENBERG, PLLC, Washington, DC.

Attorney for Defendant.

**MEMORANDUM OPINION**

February 25, 2008

Farnan, District Judge

Presently before the Court is Defendant's Motion for Judgment of Acquittal (D.I. 117)("Motion").[1] On September, 18, 2007, the Defendant, Russell D. Berscht, was convicted of conspiracy (18 U.S.C. § 371), bank fraud (18 U.S.C. §§ 1344 and 2), and wire fraud (18 U.S.C. §§ 1343 and 2) after a six-day jury trial. The Defendant has filed, pursuant to Federal Rule of Criminal Procedure 29(c),[2] a motion to set aside that verdict. For the reasons discussed, Defendant's Motion will be denied.

I.   Background

The relevant background is the evidence presented at trial concerning the Defendant's participation in and knowledge of a conspiracy to commit bank fraud and wire fraud. Generally, the evidence pertains to the Defendant's involvement in a scheme to steal large checks issued by U.S. corporations, alter those checks to make them payable to entities owned by the Defendant or co-

---

[1] The Court will treat Defendant's Motion for Acquittal and Incorporated Memorandum (D.I. 130) as the memorandum of law in support of the earlier filed Motion for Judgment of Acquittal (D.I. 117). This Memorandum Opinion thus disposes of both Motions.

[2] Federal Rule of Criminal Procedure 29(a) states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Rule 29(c)(1) permits the defendant to file a motion for judgment of acquittal within seven days of the verdict. The verdict in this case was returned on September 18, 2007 (D.I. 115), and the Motion was filed on September 25, 2007 (D.I. 117).

1

conspirators, and then deposit and distribute those funds for the benefit of the Defendant and co-conspirators. The specifics of this information will be discussed in the Discussion section, infra.

## II. Standard of Review

When considering a motion for judgment of acquittal, the Court is bound to "view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences." United States v. Lacy, 446 F.3d 448, 451 (3d Cir. 2006). In other words, the Court must "consider the evidence in the light most favorable to the Government and affirm the judgment if there is substantial evidence from which a rational trier of fact could find guilt beyond a reasonable doubt." United States v. Haywood, 363 F.3d 200, 204 n. 3 (3d Cir. 2004) (internal quotation marks omitted).

## III. Discussion

The Defendant contends that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that the Defendant was guilty of (1) conspiracy to commit bank fraud or wire fraud, (2) bank fraud, or aiding and abetting bank fraud, and (3) wire fraud, or aiding and abetting wire fraud.

2

A. <u>Elements of Conspiracy, Bank Fraud, and Wire Fraud</u>

To sustain a conviction of conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 371, the Government must prove beyond a reasonable doubt that (a) two or more persons agreed to commit wire and bank fraud; (b) the Defendant was a member of the conspiracy; (c) the Defendant joined the conspiracy knowing of its objective to commit fraud and intending to join together with at least one other alleged conspirator to achieve those objectives; and (d) at some time during the existence of the conspiracy, at least one of its members performed an overt act to further the objectives of the conspiracy.

To sustain a conviction of bank fraud under 18 U.S.C. § 1344, the Government must establish beyond a reasonable doubt each of the following elements: (a) the Defendant knowingly executed a scheme to defraud; (b) the scheme included a material misrepresentation or the concealment of a material fact; (c) the Defendant had the intent to defraud; and (d) the defrauded financial institution was federally insured. To sustain a conviction of wire fraud under 18 U.S.C. § 1343, the Government must establish beyond a reasonable doubt the same first three elements of bank fraud described above. Additionally, the Government must establish that the Defendant caused an electronic communication to be transmitted in interstate or international commerce.

B. <u>Elements the Defendant Contends Insufficient Evidence Exists On</u>

The Defendant contends that the evidence established at trial was insufficient to support the jury verdict on conspiracy and bank and wire fraud in three key respects: (1) no evidence established that the bank account into which the Enron check[3] was deposited was under the control of the Defendant or any of his alleged co-conspirators; (2) no evidence established that the Defendant conspired with anyone to break the law, and (3) even assuming some kind of conspiracy existed, no evidence established the Defendant's criminal intent. The Court will address these contentions in turn.

1. Control Over the Deposited Funds

With respect to the Defendant's first contention, the Court concludes that sufficient evidence existed regarding the Defendant's control over the deposited funds to support the jury's verdict. The Government presented evidence at trial, through the testimony of Sherri Jordan, a former Enron employee, and Paula Leber, a Citibank employee, that Enron wrote a check in March 2001 to Prudential Insurance Company to pay for Enron's employee

---

[3]While the Government presented evidence of multiple checks that had been stolen and altered, it focused its attention on two: a check issued by Enron in March 2001 for approximately $350,116; and a check issued by Compaq written in July 2001 for approximately $367,000. The Government focused its attention exclusively on the Enron check in the fraud counts, and on the Enron and Compaq checks in the conspiracy count.

4

disability benefits. The check for approximately $350,116 was stolen and the payee line altered to be made payable to "Manshell." It is uncontroverted that this Enron check was deposited in a trust account, Rurik Trust, for the benefit of Mansell Investment Corporation in the Cayman Islands. Documents admitted into evidence during trial, including Mansell account opening forms and a letter of wishes from the Defendant instructing Rurik Trust how to dispose of Mansell's assets in the event of the Defendant's demise, as well as the testimony of Rurik Trust owner Roger Hendrickson, establish that Mansell Investment Corporation was created for the benefit of and controlled solely by the Defendant. Lastly, Hendrickson testified that he understood that the Enron check was for the benefit of Mansell, despite the spelling "Manshell," because he had no other clients with names remotely close to "Manshell," and because the Defendant called Rurik to confirm the receipt of the "$350,000 check" that came via Federal Express.

The Defendant contends that "there is not a scintilla of evidence establishing that the Rurik Trust account at [Royal Bank of Canada]," into which the Enron check was deposited, "was under the control" of the Defendant or any of his alleged co-conspirators. (D.I. 130 at 15-16.) Hendrickson was under no obligation, the Defendant contends, to request a wire transfer of the Enron proceeds from the Royal Bank of Canada ("RBC") to the

Defendant if he suspected wrongdoing. Even if Hendrickson did have such an obligation, the Defendant contends, the testimony was unequivocal that Mansell had no direct banking relationship whatsoever with the RBC. The Court finds this contention unpersuasive: that Rurik Trust, the fiduciary to the Defendant's Mansell Investment Corporation, ultimately deposited the Enron check into the RBC is largely irrelevant to the issue of the Defendant's control over the funds. The Defendant's control over the deposited Enron check was evidenced by his ability to promptly distribute the Enron funds, through wire instructions to Rurik Trust, to himself, his father, his girlfriend, and his co-conspirators.

2. Participation In a Criminal Conspiracy

With respect to the Defendant's second contention, the Court concludes that sufficient evidence was introduced regarding the Defendant's involvement in a conspiracy to break the law to sustain the jury verdict. In addition to the evidence discussed above, the Government offered evidence at trial regarding Craig Hurst and Peter Clironomos, the Defendant's co-conspirators.[4] Evidence admitted at trial established that the Enron check was sent from Clironomos's corporate entity, Kallista, in Vancouver, Canada, directly to Rurik. The Defendant's confirmation call to

---

[4] Following the grand jury indictment of the Defendant and Clironomos in this case, Clironomos committed suicide.

6

Rurik established that he knew the amount of the incoming (Enron) check and that it was being shipped via Federal Express. Evidence admitted also established that the Defendant traveled to the Cayman Islands with Hurst to meet with Hendrickson once some but not all of the Enron proceeds had been distributed. The Defendant instructed Rurik to wire $9,000 of the Enron funds to Hurst. Evidence was also admitted regarding a telephone call that the Defendant received from Clironomos while he was traveling to the Cayman Islands with Hurst. The Defendant testified at trial that, in this call, Clironomos instructed the Defendant to wire $189,000 of the Enron funds to an account in China and $76,000 to Clironomos's Kallista account in Canada. The Defendant then relayed those same instructions to Rurik. The Defendant also instructed Rurik to distribute approximately $70,000 (cumulative) of the Enron funds to himself, his father, and his girlfriend.

Prior to the distribution of all the Enron funds, Hendrickson requested information on the source of the funds from the Defendant. The Defendant repeatedly delayed answering Hendrickson's questions, before eventually providing documents from a purported International Investment Group ("IIG"). Neither the existence of IIG itself nor its alleged President, Jack Falk, could be verified by Hendrickson, and the Defendant admitted to never having had contact with, or attempting to contact, IIG himself.

7

The Government also offered evidence at trial regarding the Defendant's involvement in an attempt to deposit and distribute a check stolen from the Compaq Corporation (the "Compaq check"). Through the testimony of Alvin Wong, an employee of HP (Compaq's successor), the Government presented evidence that Compaq wrote the $367,000 check to SonicAir in July 2001. When the Defendant presented this check, which had the identical check number and vendor code for Sonic Air, to his employer, Octagon Capital, it was made out to Octagon. According to Tony Fulgenzi, the Defendant's supervisor, the Defendant told Fulgenzi that an individual named Fouzi Zein with the Tajikcan Development Corporation had worked as a consultant for Compaq and wanted to use his compensation to invest with the Defendant through Octagon. Wong told the jury that Compaq had no records of any relationship with Zein or Tajikcan. The Defendant admitted at trial that he recognized the handwriting on the Fouzi Zein application form he provided to Octagon as that of Craig Hurst.

The Defendant contends that no evidence, direct or circumstantial, established an illegal motive to the Defendant's friendship with Hurst or any relationship beyond a 30-second phone call with Clironomos. Based on the substantial circumstantial evidence described above, the Court concludes that sufficient evidence was admitted at trial for the jury to find that the Defendant participated in a conspiracy with an illegal objective.

8

3.  Intent to Defraud

With respect to the Defendant's third contention, the Court concludes that sufficient evidence was admitted regarding the Defendant's intent to defraud to sustain the jury verdict. In addition to the evidence discussed above, the Government introduced evidence of the Defendant's experience and sophistication as an investment advisor. The Defendant admitted that he was compensated approximately $70,000 of the Enron funds despite providing no investment services.

The Defendant contends that none of the evidence introduced establishes that the Defendant knew the Enron check was stolen and altered, and that he thus could not have had an intent to defraud. The Defendant contends that, like himself, neither Hendrickson nor the Royal Bank of Canada suspected that the Enron check had been altered. Such a focus on physical evidence is misplaced. The Defendant need not have recognized alterations on the check's face to have known that it was stolen and altered. Sufficient circumstantial evidence was admitted at trial, including the Defendant's compensation for providing no investment services, his role in depositing and distributing the stolen funds, his role in providing fabricated cover stories, and his involvement with a second third-party check (the Compaq check) after the Enron check was discovered to be fraudulent, from which the jury could have found the requisite criminal intent.

Accordingly, the Court will deny Defendant's Motion for Judgment of Acquittal.

## IV. Conclusion

For the reasons discussed, the Court will deny Defendant's Motion For Judgment Of Acquittal.

An appropriate Order will be entered.